**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BANKERS' BANK NORTHEAST, | Civ. No. _____ |
| Plaintiff, | |
| v. | COMPLAINT FOR NEGLIGENCE, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND PROFESSIONAL MALPRACTICE |
| RICHARD ALDEN, EVERETT L. AYER, RICHARD L. GOODWIN, AL C. GRACEFFA, GEORGE W. HESELTON, DANIEL F. HOLLINGDALE, ROBERT P. LACASSE, ARTHUR C. MARKOS, PAUL F. MCCLAY, JOHN G. RIZZO, and BERRY, DUNN, MCNEIL & PARKER, | |
| Defendants. | |

## INTRODUCTION

1.      This is an action against certain former directors and officers of the Savings Bank of Maine Bancorp ("SBM")[1], and SBM's accountant and auditor, Berry, Dunn, McNeil & Parker ("Berry Dunn") (collectively, "Defendants"), arising out of Defendants' negligent misrepresentations and professional malpractice in connection with Plaintiff Bankers' Bank Northeast's ("BBN") $18 million loan to borrower, SBM on September 16, 2008 (the "Original Loan").

2.      During the spring of 2008, SBM and BBN entered into exploratory negotiations regarding whether BBN would be willing to provide SBM with a revolving loan. Savings Bank

---

[1] The Savings Bank of Maine Bancorp was a holding company whose principal asset was the Savings Bank of Maine bank. The directors of the Savings Bank of Maine Bancorp are identical with those of the Savings Bank of Maine bank. Unless otherwise indicated, this Complaint refers to the Savings Bank of Maine Bancorp, the Savings Bank of Maine and any subsidiaries of the Savings Bank of Maine Bancorp or the Savings Bank of Maine bank, collectively, as "SBM."

of Maine Bancorp ("SBM") was a federally chartered bank holding company headquartered in Maine, purportedly seeking to raise additional capital for use by its principal business, the Savings Bank of Maine. BBN was, and remains, a Connecticut-chartered bank that provides banking services to more than 200 community banks and credit unions. BBN represented a consortium of community banks that would each provide a portion of the money loaned to SBM, and is authorized to bring this action.

3.    In response to BBN's due diligence requests, SBM provided BBN with its consolidated financial statements for the year ending December 31, 2007, audited and signed by Berry Dunn ("2007 Audited Financial Statements"), dated March 26, 2008. Berry Dunn included an "Independent Auditor's Report" with the 2007 Audited Financial Statements affirming that they "present[ed] fairly, in all material respects, the consolidated financial position of Savings Bank of Maine and Subsidiaries as of December 31, 2007 and 2006, and the consolidated results of their operations and their consolidated cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America." In July 2008, SBM also provided BBN with a copy of its monthly profit summary for the period through June 30, 2008 ("June 2008 Monthly Profit Summary").

4.    The 2007 Audited Financial Statements provided by SBM and certified to by Berry Dunn depicted SBM as a successful bank with a profitable lending business, a strong balance sheet and a high ratio of capital to assets. Problem loans appeared to be well controlled, representing a small portion of SBM's loan portfolio. SBM was purportedly well capitalized and SBM's lending business was apparently highly profitable.

5.    Despite the rosy representations by SBM and Berry Dunn, the 2007 Audited Financial Statements were false and dramatically overstated SBM's financial position and results

of operations.  Specifically, critical aspects of SBM's financial performance – its loan loss provision and its Loan Loss Allowance – were false and inadequate.

6.     SBM's loan loss provision, the amount it is required to set aside to cover losses in its loan portfolio, was a fundamental measure of its performance and creditworthiness.  As of December 31, 2007, SBM had loaned out over $700 million, much of it secured by real estate in Central, Northern and Downeast Maine.  SBM's $700+ million in loans far exceeded its $79 million in capital.  The quality of SBM's loan portfolio and its ability to accurately monitor the value of its loan portfolio were extremely important factors in assessing SBM's financial status. Reflecting the importance of these issues, sound banking practices required SBM to implement controls on underwriting so that the individual loans were prudently made, and to institute rigorous internal controls over its loan portfolio (*e.g.*, proper loan review and loan grading) to ensure that troubled loans were quickly identified and brought into compliance.

7.     To present an accurate picture of SBM's financial status, the 2007 Audited Financial Statements should have set aside a loan loss provision that reflected the "probable" incremental losses in SBM's $700+ million loan portfolio and subtracted that provision from SBM's earnings for the year and from SBM's reported capital.  Under generally accepted accounting principles ("GAAP") and the representations in the 2007 Audited Financial Statements themselves, SBM's management was supposed to closely monitor SBM's loan portfolio and determine what losses were "probable" based on "historical experience, the nature and volume of the loan portfolio, adverse situations that may affect borrower's ability to repay, estimated value of any underlying collateral and prevailing economic conditions."  And Berry Dunn, as SBM's auditor, had a duty to audit the provision calculated by SBM's management, the process used by SBM's management to arrive at the provision, and to further assess the adequacy

of the Allowance for Loan and Lease Losses ("ALLL") to ensure that it was reasonable and adequately supported by loan information maintained at SBM. In this respect, both the SBM Defendants and Berry Dunn had a duty to ensure that the 2007 Audited Financial Statements reasonably presented SBM's financial status.

8.      In fact, the SBM Defendants and Berry Dunn completely failed to discharge their duty. Undisclosed to BBN, SBM's derelict loan department had no internal mechanisms to collect and/or maintain information about SBM's loan portfolio that would allow for the assessment of whether a loan loss was "probable." SBM regularly failed to collect information about borrowers' cash flow and business prospects. Accordingly, neither SBM nor Berry Dunn were capable of reasonably assessing the extent to which borrowers had the means to repay SBM. SBM regularly failed to meet even rudimentary lending standards such as obtaining appraisals for property used as collateral for loans. Thus, SBM and Berry Dunn were utterly unable to assess the extent to which SBM could recover the principal of a loan in the event of default. Without this basic information, SBM and Berry Dunn were "flying blind" regarding what losses SBM would likely sustain from its loan portfolio. Yet in the 2007 Audited Financial Statements, which were finalized on March 26, 2008, many months into a deep recession, SBM and Berry Dunn falsely represented that after a careful assessment, SBM's probable losses for 2007 required a loan loss provision of only $2.4 million.

9.      In reliance on the false assurances of the SBM Defendants and Berry Dunn, BBN and the consortium of banks it represented agreed to make an $18 million loan to SBM on September 16, 2008. In the Loan and Pledge Agreement for the Original Loan, the SBM Defendants made several additional false statements. SBM covenanted that SBM's financial statements as of December 31, 2006, December 31, 2007 and June 30, 2008 were prepared in

4

accordance with GAAP and "present fairly the financial positions" and the results of operations of SBM. The SBM Defendants also represented that "Since June 30, 2008, there has been no material change in the condition, financial or otherwise" of SBM.

10.    These statements were false when made because: (a) SBM did not have the information necessary to prepare the loss provision portion of its financial statement in accordance with GAAP and (b) the financial condition of SBM's borrowers had already declined precipitously such that SBM had already suffered serious loan losses that were not disclosed in SBM's financial statements. In 2009, the Office of Thrift Supervision ("OTS"), the federal agency that regulated SBM, stepped in to end SBM's improper refusal to adequately recognize the loan losses that it had suffered. The OTS required SBM to increase its loan provision for the quarter ending December 31, 2008 by $22.5 million, approximately ten times the provision that SBM had recognized in 2007 and far more than the inadequate loan loss provision reflected in the monthly profit summary for the period running through June 2008. For example, between May and June 2008, SBM set aside $17,500 for loan losses. Furthermore, as SBM President Arthur Markos admitted on May 18, 2009, the accurate accounting for SBM's loan losses caused SBM's Tier One Capital Ratio[2] to decline to 7.61%, below the 8% that BBN had mandated in the September 2008 Loan and Pledge Agreement.

11.    Events in 2009 further underscored the complete failure of the SBM Defendants and Berry Dunn to reasonably present SBM's probable loan losses. On April 29, 2009, Anthony Nowak, a consultant hired by SBM, presented the results of a review of nine large loans in SBM's portfolio. Nowak concluded there was a "sluggishness to recognize and document

---

[2] Tier One Capital Ratio is a measure of a bank's capital adequacy. It is the ratio of a bank's core equity capital to its total risk-weighted assets.

changes in borrower risk profiles" and that multiple major downgrades in risk ratings were necessary. Moreover, Nowak further observed that since the nine loans "encompass[ed] the largest exposures in the Bank's non-homogeneous loan portfolio where presumably due diligence is strongest," it was likely that "similar risk rating variances prevailed throughout the portfolio." In other words, it was likely that large numbers of SBM's loans were far riskier than represented and SBM had to take additional loan provisions to reflect the heightened risk of loss.

12.     In August 2009, the OTS issued a cease and desist order against SBM. Based on its examinations of SBM in March 2009, the OTS found that SBM was engaged in unsafe or unsound banking practices in violation of federal statutes and regulations. The list of violations was extensive. Among other things, the OTS cited SBM for failing to have adequate internal controls, failing to obtain appraisals on real estate loans, operating with insufficient capital and operating with unacceptable levels of high risk loans and nonperforming assets. There is no reason to believe that SBM's internal controls were any better during the summer and fall of 2008.

13.     Also in August 2009, Chaston Associates, another SBM consultant, conducted a loan portfolio review of 279 individual loans totaling $344 million. The results were damning. Among other things, the Chaston report determined that:

    a.  "[T]he overall credit risk assessment is unacceptable . . . reflecting an elevated level of Criticized and Classified loans in the portfolio which, as of the on site review, were continuing to grow";

    b.  SBM had $201 million in problem loans, representing 232% of risk based capital, including $160 million in "more problematic" loans;

c. Chaston could not even complete a FASB Statement No. 114 analysis on many impaired loans because "the majority of appraisals were either outdated or non-existent";

d. Credit administration was "deficient" based on the "number and exposure level of credit administration issues." The dollar exposures of primary credit data exceptions where SBM lacked current financial information used to determine whether borrowers' cash flow was adequate to meet debt service requirements, was "well above acceptable levels";

e. SBM needed to reserve an additional $17 million to cover bad loans.

14.     By early 2010, SBM's unfolding loan losses threatened to render it insolvent, and SBM faced potential closure by the OTS and appointment of the Federal Deposit Insurance Corporation ("FDIC") as receiver. To avoid this possibility, SBM agreed to a restructuring plan led by Yorkshire Capital LLC ("Yorkshire") whereby a group of investors would invest additional capital in SBM. As part of the restructuring, the Loan from BBN was revised on May 26, 2010 ("Amended Loan") and the Loan's principal was reduced from $18 million to $9 million.

15.     BBN is entitled to recover this money, along with interest owed, from the SBM Defendants and Berry Dunn because BBN relied on the misrepresentations made by the Defendants in extending the Loan to SBM.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332(a)(i) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the property that is the subject of the action is situated in this District. Additionally, the forum selection clause in the May 2010 Amended Loan Agreement is in this District.

## FACTUAL ALLEGATIONS

### A.    The Parties

18.     Plaintiff Bankers' Bank Northeast ("BBN") is a Connecticut-chartered bank that provides banking services to more than 200 community banks and credit unions.  BBN represents a consortium of community banks that made the Loan to SBM.

19.     Defendants Everett L. Ayer, Richard L. Goodwin, Al C. Graceffa, George W. Heselton, Daniel F. Hollingdale, Robert P. Lacasse, Paul F. McClay, and John G. Rizzo were directors of Savings Bank of Maine Bancorp.  In addition, since the Board of the Savings Bank of Maine and the Board of the Savings Bank of Maine Bancorp were identical, these Defendants were also directors of the Savings Bank of Maine.  Plaintiff is informed and believes that each of these Defendants is a resident of the State of Maine.  Throughout the relevant period, these Defendants exercised control over SBM.

20.     Defendant Richard Alden ("Alden") was formerly the Executive Vice President of Lending at Savings Bank of Maine.  Upon information and belief, Defendant Alden is a resident of the State of Maine.  Plaintiff regularly communicated with Alden in connection with the Loan.

21.     Defendant Arthur Markos ("Markos") was the president and CEO of Savings Bank of Maine Bancorp and was also a director of both Savings Bank of Maine Bancorp and Savings Bank of Maine.  Throughout the relevant period, Markos exercised control over SBM. Upon information and belief, Defendant Markos is a resident of the State of Maine.

22.    All the Defendants in paragraphs 19-21 are collectively referred to as the "SBM Defendants."

23.    Defendant Berry, Dunn, McNeil & Parker ("Berry Dunn") was SBM's outside accountant and auditor throughout the relevant period.  In this capacity, Berry Dunn signed and vouched for the 2007 Audited Financial Statements that were provided to BBN.  According to its website, Berry Dunn is the "largest independent certified public accounting and management consulting firm in Northern New England" and "provides audit and accounting, tax, information technology, and management consulting services to a wide range of organizations."  Berry Dunn's website provides the following description of its audit services:

> An audit enables us to express an opinion as to whether financial statements are fairly stated, in all material respects, in accordance with generally accepted accounting principles. We perform tests of your financial data, confirm information with third parties as necessary, analyze the information for unusual trends or relationships, and obtain an understanding of your company's internal control and how it impacts the financial reporting process.

In describing why a potential corporate customer should select its audit services, Berry Dunn affirmed that it has experience with the industries it serves that allows it to identify accounting "issues" pertinent to those industries:

> Our reputation as a full-service financial and management consulting firm is dependent on both our breadth of services and our depth of industry expertise. We keep abreast of the latest trends, regulations, and issues in the industries we serve, allowing us to provide you with more efficient service. Because we know your industry, we can propose solutions and point out opportunities that others might miss.

**B.    The Loan and Defendants' Misrepresentations**

24.    In the summer of 2008, SBM sought to raise money for use by the Savings Bank of Maine.

9

25.     As a bank that provides services to other banks, BBN offered a type of bank holding company loan that satisfied SBM's need.  Accordingly, SBM and BBN entered into negotiations regarding a potential loan.

26.     At the time, the United States was well into a severe economic downturn which had resulted in the insolvency or threatened insolvency of a record number of banks that had amassed an unsustainable amount of bad loans.  As such, the credit quality and risk in SBM's $700+ million loan portfolio was an area of keen interest for BBN.  In order to determine SBM's creditworthiness, BBN needed to have an honest assessment of what loan losses SBM had already sustained and what loan losses BBN would probably sustain. In determining whether to approve the Loan to SBM, this was an issue of concern for BBN.

27.     Defendants addressed the issue of potential SBM loan losses by providing BBN with the 2007 Audited Financial Statements, June 2008 Monthly Profit Summary and the 2007 Loan Review Report.  These reports falsely represented that SBM was taking prudent steps to accurately monitor its loan losses and that Defendants' careful assessment indicated that SBM's probable loan losses were limited.  There was no reason for BBN to be anything but comforted by Defendants' false representations.

i.     The SBM Defendants and Berry Dunn Made Misrepresentations in the 2007 Audited Financial Statements

28.     On the very first page of the 2007 Audited Financial Statements, Berry Dunn included a signed letter in which it represented that:

> We have audited the accompanying consolidated balance sheets of Savings Bank of Maine and Subsidiaries as of December 31, 2007 and 2006, and the related consolidated statements of operations and comprehensive (loss) income, changes in equity capital and cash flows for the years then ended . . . *We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit*

10

*to obtain reasonable assurance about whether the financial statements are free of material misstatement.*  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe our audits provide a reasonable basis for our opinion. . .

In our opinion . . . the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Savings Bank of Maine and Subsidiaries as of December 31, 2007 and 2006, and the consolidated results of their operations and their consolidated cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

(Emphasis added).

29.    These statements were false in at least two material, related respects.  First, Berry Dunn did not, and could not, perform an audit of SBM's consolidated financial statements "in accordance with auditing standards generally accepted in the United States of America" by, for example, assessing "significant estimates made by management" because, as was later revealed, SBM had so little information about the creditworthiness of its portfolio that it was impossible to determine what its probable loan losses were as required by FASB Statement Nos. 5 and 114. SBM largely lacked the information about borrowers' financial condition that would allow it to determine borrowers' ability to repay loans, nor did it even have current appraisals of real estate posted as collateral for loans.  Consequently, as Chaston Associates discovered in August 2009, it was impossible to determine the amount of SBM's loan loss provision in accordance with GAAP because "the majority of appraisals were either outdated or non-existent" and loan grades were overstated.

30.    The second falsehood was Berry Dunn's representation that "the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Savings Bank of Maine and Subsidiaries as of December 31, 2007 and

2006." Because SBM did not maintain information sufficient to assess its actual loan losses, neither the SBM Defendants nor Berry Dunn could reliably calculate SBM's provision for loan losses and, as a result, could not reliably calculate its annual income or capital. The fundamental absence of information at SBM rendered a proper audit utterly impossible.

31.    The 2007 Audited Financial Statements also purported to present SBM's financial results and position as of December 31, 2007 and December 31, 2006. For example, the 2007 Audited Financial Statements indicated that as of December 31, 2007:

    a.    the loans in SBM's portfolio had a value of $704,505,465 net of allowance for loan losses of $16,459,565;

    b.    SBM had $79,655,683 in total equity;

    c.    SBM's provision for loan losses was $2,367,400; and

    d.    SBM's net interest income after provision for loan losses was $29,465,662.

32.    These statements were false when made because neither SBM nor Berry Dunn had a basis for determining that SBM's loan provision was merely $2,367,400. As described in the preceding paragraphs, SBM largely lacked the information about borrowers' financial condition that would allow it to determine borrowers' ability to repay loans, and did not have current appraisals of real estate posted as collateral for loans. In addition to being unreliable, these statements also overstated SBM's financial position because, as later revealed by the OTS, SBM's loan losses were far higher than indicated in the 2007 Audited Financial Statements. Indeed, for the year ending December 31, 2008, the OTS required SBM to recognize an additional $22.5 million for loan losses, approximately ten times the provision that SBM had recognized in 2007.

33.    SBM's 2007 giveaway of the entirety of its 2007 operating income through its so-called "Economic Development Credit" is another indication that SBM's loan portfolio was deteriorating.  Under the program, in the guise of charitably assisting the community during economic hard times, SBM returned its entire 2007 operating income to borrowers by rebating to them three months interest on their loans.  Although not facially suspicious at the time, in light of the revelation that SBM's financial statements dramatically understated loan losses, this program appears to have been part of a scheme by SBM to forestall recognizing massive loan losses by artificially propping up the troubled loans with the three months interest rebate.

34.    In a section entitled "Use of Estimates," Berry Dunn represented in the 2007 Audited Financial Statements that "[i]n connection with the determination of the allowance for loan losses and the carrying value of other real estate owned, management obtains independent appraisals for significant properties."  This representation was false because SBM regularly failed to obtain such appraisals.  As Chaston Associates found, "the majority of appraisals were either outdated or non-existent."

35.    In a section entitled "Allowance for Loan Losses," Berry Dunn represented in the 2007 Audited Financial Statements:

> The allowance for loan losses is established as losses are estimated to have occurred through a provision for loan losses charged to earnings. . . The allowance for loan losses is evaluated on a regular basis by management and is based upon management's periodic review of the collectibility of the loans in light of historical experience, the nature and volume of the loan portfolio, adverse situations that may affect the borrower's ability to repay, estimated value of any underlying collateral and prevailing economic conditions. . . .

> A loan is considered impaired when, based on current information and events, it is probable that the Bank will be unable to collect the scheduled payments of principal or interest when due according to the contractual terms of the loan agreement.  Factors considered by management in determining impairment

include payment status, collateral value, and the probability of collecting scheduled principal and interest payments when due.

36.     The above statement misrepresents that SBM was conducting periodic reviews of its loan portfolio and rendering financially prudent determinations as to the collectability of loans in the portfolio. As was later revealed, even for its biggest loans, SBM regularly failed to collect information about adverse situations that might affect borrowers' ability to repay, and failed to obtain appraisals. As a result, SBM was unable to detect loan downgrades and was utterly incapable of accurately gauging its probable loan losses.

37.     Berry Dunn and the SBM Defendants also misrepresented SBM's capital ratios in the 2007 Audited Financial Statements. SBM supposedly had a Total Capital to Risk Weighted Assets ratio of approximately 12.1%, exceeding the 10% needed to be considered "well capitalized."[3] SBM's Tier 1 Capital to Risk Weighted Assets ratio was supposedly 10.9%, exceeding the 6.0% needed to be considered "well capitalized." SBM's Tier 1 Capital to Total Assets ratio was supposedly 8.4%, exceeding the 5.0% needed to be considered "well capitalized." These statements were all false because they were based on incorrect capital figures for SBM that should have been reduced to reflect SBM's much higher loan losses.

ii.     The SBM Defendants Made Misrepresentations in the June 2008 Monthly Profit Summary

38.     In July 2008, SBM provided BBN with its monthly profit summary through June 2008 to induce BBN to enter into the loan agreement.

39.     The June 2008 Monthly Profit Summary represented that SBM earned between $866,000 and $1,290,900 in each of the months between January 2008 and June 2008, inclusive.

---

[3] Plaintiff refers to the capital requirements during the relevant time period. These requirements may have increased in reaction to the financial crisis.

14

These representations of monthly earnings were false because the income statements did not accurately account for SBM's probable loan losses, which SBM did not reliably calculate and which were far larger than reflected in the June 2008 Monthly Profit Summary. For example, the June 2008 Monthly Profit Summary represented that between May 2008 and June 2008, the reserve for loan losses grew by less than $20,000. This was false because SBM was not reliably calculating its loan losses and such losses were actually much higher.

40.    The June 2008 Monthly Profit Summary represented that SBM's capital ratio in June 2008 was 11.52%, which was false because it was based on an incorrect capital figure for SBM that was inflated by the failure to adequately recognize loan losses.

iii.    The SBM Defendants Made Misrepresentations in the Loan and Pledge Agreement

41.    The SBM Defendants made misrepresentations in the Loan and Pledge Agreement entered into in connection with the Original Loan.

42.    "To induce [BBN] to enter into" the Original Loan agreement, SBM made the following warranties:

> **5.1.5    Financial Statements; Fiscal Year.**    The balance sheets and income statements of Bank as of December 31, 2006, December 31, 2007 and June 30, 2008 and the Bank's Call Report dated June 30, 2008 have been prepared in accordance with GAAP (with the exception of the write-down of goodwill in the December 31, 2007 financial statements), and present fairly the financial positions of Bank, as applicable, at such dates and the results of Bank's operations for such periods. Since June 30, 2008, there has been no material change in the condition, financial or otherwise, of Borrower or the Bank. The fiscal years of Borrower and Bank end on December 31 of each year.

> **5.1.6    Full Disclosure.**    The financial statements referred to in **subsection 5.1.5** hereof do not, nor does this Agreement or any other written statement of any Borrower to Lender, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Borrower has failed to disclose to Lender in writing which materially affects adversely or will materially affect adversely the Properties, business, prospects, profits or condition

(financial or otherwise) of Borrower or the Bank or the ability of Borrower to perform this Agreement or the other Loan Documents.

43.     These statements were false in many respects.  As explained above, SBM's financial statements were materially inaccurate because the SBM Defendants' grossly negligent failure to institute adequate internal controls in its loan department made it impossible to correctly account for loan losses, and the dramatic understatement of loan losses skewed other indices in the financial report (*e.g.*, capital, Tier 1 ratios, earnings) causing them to be materially false.  By September 16, 2008, the date of the Loan and Pledge Agreement, SBM's loan portfolio had already suffered millions of dollars in loan losses that were not reflected in SBM's financial statements and were not disclosed at the time of the Loan.  Thus, in violation of §5.1.6 of the Loan Agreement, SBM already possessed facts "which materially affects adversely or will materially affect adversely" SBM and SBM's ability to repay the Original Loan.

44.     Furthermore, SBM covenanted that it would maintain a capital ratio above 8%:

> **6.3.1  <u>Minimum Tier One (Core) Capital Ratio</u>.**  Maintain a Tier One (Core) Capital Ratio of not less than eight percent (8%) as of March 31, June 30, September 30, and December 31 of each calendar year.  Compliance with this covenant shall be tested quarterly by reference to the Call Reports submitted by the Bank to the OTS.

45.     But as Defendant Markos revealed in 2009, the OTS required SBM to set aside an additional $22.5 million in loan provisions at the end of 2008, only three months after the Original Loan Agreement was executed, which dropped SBM's Tier One Capital Ratio below the minimum requirement.  Thus, by September 16, 2008, SBM was likely already below the minimum requirement and was certainly much closer to the minimum requirement than its financial statements indicated.

**C.    Defendants Knew or Reasonably Should Have Known That Their Statements Were False**

46.    The SBM Defendants knew or reasonably should have known that their statements were false.  As SBM's officers and directors during the relevant period, the SBM Defendants were the individuals who implemented or oversaw SBM's deficient policies concerning SBM's loan portfolio and who had responsibility for making the estimations that went into SBM's financial statements.  For example, the OTS's Directors' Responsibilities Handbook, dated April 2008, states that as directors of SBM, Defendants Markos, Ayer, Goodwin, Graceffa, Heselton, Hollingdale,  Lacasse, McClay and Rizzo had a responsibility to "monitor and assess operations" at SBM by, among other things, being aware of the business climate affecting SBM, reviewing and heeding regulatory examinations and discussing key issues with senior management both in and out of board meetings.   In addition, the OTS states that the "board must ensure that the association maintains an effective system of internal controls."  According to the OTS, the SBM Defendants knew or reasonably should have known that it was impossible to reliably estimate losses on SBM's $700+ million loan portfolio without collecting basic information about changes in borrowers' income or appraisals of property used as collateral.

47.    In addition, 12 C.F.R. §363.2 required the Board to ensure that SBM's financials were prepared in accordance with generally accepted accounting principles.   12 C.F.R. §363.3 required SBM to hire an outside auditor accountant "to determine and report whether the financial statements are presented fairly and in accordance with generally accepted accounting principles."

48.    Berry Dunn knew or reasonably should have known that its statements were false. As SBM's auditor, it was Berry Dunn's job to test the "significant estimates made by management" to ensure that those estimates, as well as the financial statements as a whole, reasonably presented the financial state of SBM. Berry Dunn admitted in its March 26, 2008 letter to the Audit Committee of SBM that the "estimate of the allowance for losses" was the "most sensitive estimate affecting the financial statements" because of, among other things, its "significance to the financial statements." Thus, SBM's loan provision and its ability to accurately assess its loan losses should have been a prime focus of Berry Dunn's.

49.    It is not possible that Berry Dunn audited SBM's critical loan provision estimates without uncovering the decrepit state of SBM's loan portfolio and SBM's utter inability to maintain adequate information about the credit status of loans in its portfolio. The Audit and Accounting Guide for Depository and Lending Institutions, dated June 1, 2010, instructs that any effective method for assessing credit losses would include:

a.  a detailed and regular analysis of the loan portfolio and off-balance sheet instruments with credit risk;

b.  procedures for timely identification of problem credits;

c.  consistent use;

d.  consideration of all known relevant internal and external factors that may affect collectability;

e.  consideration of all loans (whether on an individual or pool-of-loans basis) and other relevant credit exposure;

f.  consideration of the particular risks inherent in the different kinds of lending;

g.  consideration of the current collateral fair values less cost to sell, where applicable;

18

h.  performance by competent and well-trained personnel;

i.  current and reliable data;

j.  good documentation with clear explanations of the supporting analyses and rationale; and

k.  identification of all subsequent events that provide additional evidence about the conditions that existed at the date of the balance sheet.

As described in this Complaint, it was readily apparent to anyone examining SBM's loan portfolio – including Chaston Associates and Nowak – that SBM's loan loss estimation process lacked *all* of these attributes.  Thus, Berry Dunn knew or reasonably should have known that SBM lacked an adequate loan loss estimation process.

50.    The Audit and Accounting Guide for Depository and Lending Institutions further states that auditors testing loan evaluations should avoid:

•    *Outdated or unreliable financial information.*  This is the reliance on old, incomplete, or inconsistent data to assess operating performance or financial capacity. Financial information should be current and complete, particularly for borrowers sensitive to cyclical fluctuations or who demonstrate significant growth or changes in operating philosophy and markets.

•    *Dependence on management representations.*  This is undue reliance on management representations even though there is no supporting evidence.  For example, such representations as "the guarantee is not signed but it is still good" or "the future prospects for this troubled borrower are promising" necessitate a critical review.

Given the magnitude of the breakdown at SBM, any reasonable audit in accordance with the above two principles would have discovered that SBM did not have an adequate method for assessing loan losses.

51.    In light of the widespread lack of information necessary to assess loan losses and the fact that SBM's loan loss provision was the most significant financial estimate in SBM's financial statements, Berry Dunn knew or reasonably should have known that it was not doing its job and that SBM's financial statements were unreliable. Indeed, Chaston Associates, a consulting group hired in 2009, was able to determine that SBM lacked sufficient information to complete FASB Statement No. 114 analysis of impaired loans. And as Anthony Nowak, another consultant, stated, the lack of due diligence occurred in connection with SBM's largest, most important loans. Therefore, had Berry Dunn undertaken even a cursory review of SBM's information, they would have uncovered a problem.

**D.    BBN Reasonably Relied on Defendants' Misrepresentations**

52.    BBN reasonably relied upon Defendants' misrepresentations in extending the Loan to SBM. Defendants made their misrepresentations to BBN in the due course of business negotiations where parties are obligated to act in good faith, and BBN had no reason to suspect that Defendants' statements were false.

53.    Berry Dunn knew that SBM intended to provide the 2007 Audited Financial Statements to BBN. Berry Dunn knew that SBM was in negotiations with BBN for the Loan. Anita Nored, SBM's treasurer, asked Jeffrey Ring, a principal at Berry Dunn, for advice concerning how the Original Loan between SBM and BBN could be structured. Berry Dunn knew that, given the size of the Original Loan, SBM could not secure it without providing BBN with its most recent audited financial statements, which were the 2007 Audited Financial

Statements. Thus, Berry Dunn knew that BBN was relying upon the 2007 Audited Financial Statements to determine whether to extend the Original Loan to SBM, and would be misled by the misstatements in the 2007 Audited Financial Statements.

**E.     Defendants' Misrepresentations Caused BBN Harm**

54.     In reliance on Defendants' misrepresentations, BBN agreed to loan SBM $18 million on September 16, 2008.

55.     In the Spring of 2009, the truth began to surface when the OTS required SBM to take an additional $22.5 million in loan loss provisions for 2008, which caused SBM's Tier One Capital Ratio to drop below the minimum 8 % requirement.

56.     Subsequently, SBM hired at least two consultants, Nowak and Chaston Associates, to examine its loan portfolio. These consultants revealed that, apparently throughout its recent history including during the period when Defendants were making their misrepresentations, SBM had not been adequately monitoring its loan losses, that this failure had obscured the fact that the credit risk profile of many borrowers had sharply deteriorated, and that SBM was required to recognize millions of dollars of additional losses.

57.     As SBM's loan losses mounted throughout 2009, SBM's capital ratio continued to fall such that by the end of 2009, it was questionable that SBM could maintain sufficient capital to operate. The situation was all the more dire because SBM's abominable loan records continued to hinder efforts to assess the depth of its loan losses.

58.     In the first half of 2010, SBM was taken over by a group of investors led by Yorkshire Capital. The takeover was a voluntary supervisory conversion, a type of takeover signifying that SBM was going to collapse absent some sort of recapitalization. The Yorkshire

group recapitalized SBM but demanded that BBN forgive $9 million of the $18 million debt incurred by SBM under the Loan.

**F.      BBN Expressly Reserved the Claims Raised in This Action**

59.      To reflect the $9 million reduction, BBN and SBM's successor in interest entered into an Amended and Restated Loan and Pledge Agreement on May 26, 2010.  Section 9 of the Amended and Restated Loan and Pledge Agreement was entitled "Mutual Releases" and contained the following paragraph:

> "Lender, on behalf of itself and its Participating Lenders, hereby waives and releases any outstanding principal (in excess of this Note) and interest or penalties due under the Original Loan Agreement and the Original Loan Note and any and all other claims, liabilities or obligations of any kind or nature whether now existing or hereafter arising, which it or they may have against Borrower and its predecessor, successor and affiliated entities, including the Bank (and any of the officers and directors of the Borrower or Bank on the date of the Original Loan Agreement) arising out of the negotiation, preparation, execution, delivery and performance of the Original Loan Agreement and Original Loan Note.  It is agreed that the Original Loan Agreement and Original Note have been superseded by the execution and delivery of the Amended and Restated Loan Agreement and Amended and Restated Note.  ***Notwithstanding the foregoing, and on the condition that the foregoing does not act in derogation of the following reservations, Lender hereby saves and reserves any and all claims, of any nature, against Borrower's accountants or under Borrower's directors' and officers' insurance policies in effect at the time of the issuance of the Original Loan Note.***

(Emphasis added).

60.      By this provision, and in particular, the last and prevailing sentence of this provision, BBN expressly reserved its rights to pursue all claims against Berry Dunn, and all claims against the SBM Defendants personally.

## FIRST CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
### (Against all Defendants)

61.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

62.    Defendants made misrepresentations of material fact in the 2007 Audited Financial Statements, June 2008 Monthly Profit Summary, 2007 Loan Review Report and Loan and Pledge Agreement.

63.    Defendants knew or reasonably should have known that their statements were false.

64.    Plaintiff reasonably relied upon Defendants' misrepresentations in making the $18 million Original Loan to SBM.

65.    As a direct and proximate result of the Defendants' misrepresentations. Plaintiff sustained substantial harm.

66.    Defendants are liable to Plaintiff as a result of the facts alleged herein.

## SECOND CAUSE OF ACTION

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against SBM Defendants)

67.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

68.    The SBM Defendants had an implied covenant of good faith and fair dealing, with their contracting party, the Plaintiff, in entering into the Loan and Pledge Agreement in connection with the Original Loan.

23

69.    By engaging in the conduct described in the Complaint, and making untrue statements to induce the Plaintiff to enter into the Loan and Pledge Agreement in connection with the Original Loan, and by failing to disclose the true state of SBM despite making statements they knew or reasonably should have known were misleading, the SBM Defendants breached their implied covenant of good faith and fair dealing.

70.    As a result of the breach, the Plaintiff agreed to make the $18 million Original Loan to SBM.

71.    As a direct and proximate result of the SBM Defendants' breach of the covenant and good faith and fair dealing with its contracting party, the Plaintiff, the Plaintiff sustained substantial harm.

72.    SBM Defendants are liable to the Plaintiff as a result of the facts alleged herein.

## THIRD CAUSE OF ACTION

## PROFESSIONAL MALPRACTICE
### (Against Berry Dunn)

73.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

74.    As SBM's outside auditor, Berry Dunn had a duty to act in accordance with auditing standards generally accepted in the United States of America and other standards of conduct that apply to outside auditors.

75.    Berry Dunn failed to satisfy these codes of conduct in that it represented that it had conducted an audit of SBM's consolidated financials for the year ending December 31, 2007 that satisfied auditing standards generally accepted in the United States of America, even though it lacked an adequate basis for testing whether SBM's loan provision was reasonable.

24

76.    As a result of Berry Dunn's malpractice, SBM's consolidated financial statement for the year ending December 31, 2007 materially overstated SBM's financial condition. Furthermore, the OTS required SBM to restate its financials for the year ending December 31, 2008.

77.    Plaintiff relied on these misstated financial statements in loaning SBM $18 million.

78.    Berry Dunn's malpractice was the direct and proximate cause of Plaintiff's loss because the loan losses by SBM hidden by Berry Dunn's malpractice ultimately forced SBM to be restructured and Plaintiff's loan to SBM to be reduced.

79.    Berry Dunn is liable to Plaintiff as a result of the facts alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor against the Defendants as follows:

A.    Awarding Plaintiff damages against the SBM Defendants personally in an amount up to the full amount of the insurance carried on the directors and officers under the directors' and officers' insurance policy in effect in September 2008.

B.    Awarding Plaintiff damages against Defendant Berry Dunn in the full amount of Plaintiff's loss and damages, including $9 million in principal, and interest suffered by the Plaintiff, and reasonably foreseeable lost business opportunities incurred by Plaintiff, all as a result of Berry Dunn's negligent misrepresentation and professional malpractice.

C.    Awarding pre-judgment and post-judgment interest as allowed by law.

D.    Awarding Plaintiff the costs and disbursements, cost of collection, and attorney fees incurred in the prosecution of this action; and

25

E.     Granting such other and further relief as the Court deems just and proper.

Dated:  February 18, 2011                    SCOTT+SCOTT LLP


_____
DAVID R. SCOTT (CT 16080)
AMANDA F. LAWRENCE (CT 27008)
ERIN GREEN-COMITE (CT 24886)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860/537-5537
860/537-4432 (fax)
drscott@scott-scott.com
alawrence@scott-scott.com
ecomite@scott-scott.com

- and -

JUDY S. SCOLNICK
THOMAS L. LAUGHLIN IV
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone:  212/223-6444
212/223-6334 (fax)
jscolnick@scott-scott.com
tlaughlin@scott-scott.com


*Attorneys for Plaintiff*


26